******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BARBARA A. IZZARELLI *v.* R.J. REYNOLDS
TOBACCO COMPANY
(SC 19232)

Zarella, Eveleigh, McDonald, Espinosa, Robinson and Vertefeuille, Js.

*Argued April 22, 2015—officially released May 3, 2016*

*David S. Golub*, with whom were *Jonathan M. Levine* and, on the brief, *Marilyn J. Ramos*, for the appellant (plaintiff).

*Theodore M. Grossman*, pro hac vice, with whom were *Jeffrey J. White*, and, on the brief, *Frank F. Coulom*, *Jr.*, and *Kathleen E. Dion*, for the appellee (defendant).

*George Jepsen*, attorney general, *Gregory T. D'Auria*, solicitor general, and *Phillip Rosario, Jonathan J. Blake* and *Thomas J. Saadi*, assistant attorneys general, filed a brief for the state of Connecticut et al. as amici curiae.

*Edward L. Sweda, Jr.*, pro hac vice, and *Michael*

*J. Walsh* filed a brief for the Public Health Advocacy Institute as amicus curiae.

*Kathleen L. Nastri* and *Jeffrey R. White,* pro hac vice, filed a brief for the American Association for Justice as amicus curiae.

*Opinion*

McDONALD, J. We have been asked by the United States Court of Appeals for the Second Circuit to consider whether the "[g]ood tobacco" exception to strict products liability contained in comment (i) to § 402A of the Restatement (Second) of Torts[1] precludes an action in this state against a cigarette manufacturer for including additives and manipulating the nicotine in its cigarettes in a manner that ultimately increases the user's risk of cancer. See 2 Restatement (Second), Torts § 402A, comment (i), pp. 352–53 (1965). The defendant, R.J. Reynolds Tobacco Company, appealed to that court from the judgment of the United States District Court for the District of Connecticut in favor of the plaintiff, Barbara A. Izzarelli, a former smoker and cancer survivor, on an action brought pursuant to Connecticut's Product Liability Act (liability act), General Statutes § 52-572m et seq. Pursuant to General Statutes § 51-199b (d), we accepted certification with respect to the following question from the Second Circuit: "Does [comment (i) to § 402A] preclude a suit premised on strict products liability against a cigarette manufacturer based on evidence that the defendant purposefully manufactured cigarettes to increase daily consumption without regard to the resultant increase in exposure to carcinogens, but in the absence of evidence of adulteration or contamination?"[2] See *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, 731 F.3d 164, 169 (2d Cir. 2013).

This case requires us to revisit our seminal strict product liability precedent, *Potter* v. *Chicago Pneumatic Tool Co.*, 241 Conn. 199, 694 A.2d 1319 (1997), and to clarify the proper purview of the two strict liability tests recognized in that case: the ordinary consumer expectation test and the modified consumer expectation test. We conclude that the modified consumer expectation test is our primary strict product liability test, and the sole test applicable to the present case. Because the obvious danger exceptions to strict liability in comment (i) to § 402A of the Restatement (Second), including "[g]ood tobacco," are not dispositive under the multifactor modified consumer expectation test, we answer the certified question in the negative.

The District Court's ruling on the defendant's motion for a new trial and its renewed motion for judgment as a matter of law sets forth the following facts that the jury reasonably could have found, which we supplement with relevant procedural history. *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, 806 F. Supp. 2d 516 (D. Conn. 2011). The relevant time frame in this case spans from the early 1970s, when the plaintiff first began to smoke, until the late 1990s, when she was diagnosed with, and treated for, cancer. The defendant has manufactured Salem King (Salem) cigarettes, the menthol cigarette brand smoked by the plaintiff, since 1956. Id., 520. In the early 1970s, the defendant identified certain weak-

nesses in its brand. Id., 521. One of the concerns identified was that almost one half of Salem users were light smokers, meaning that they smoked one to fifteen cigarettes per day. In an effort to capture a larger share of its desired market, the defendant modified Salem's design. Id.

The defendant's internal research had disclosed two important factors concerning nicotine, a naturally occurring but addictive component of tobacco. First, the form of the nicotine affects the rate at which it is absorbed and delivers its " 'kick' " to the smoker. Id. Of nicotine's two principal forms, bound and free, free nicotine (also known as freebase nicotine) moves through the body's blood/brain barrier faster and provides the smoker with a higher and more immediate kick. Addiction liability increases in relation to the amount and speed of the delivery of free nicotine.[3] Second, there is an effective dose range of nicotine necessary to maintain addiction. Id. The lowest nicotine yield (nicotine actually delivered to the smoker) that would maintain addiction requires the smoker to receive between five and eight milligrams of nicotine daily. Id., 523.

The defendant modified its Salem cigarettes in a manner that took both of these factors into account. The defendant had identified seven methods for manipulating the nicotine kick of its cigarettes, which it incorporated into its product. Id., 522. Among those methods was adding ammonia compounds to turn the nicotine into its more potent freebase form. Adding acetaldehyde, one of scores of chemicals added to Salem cigarettes,[4] would cut the harshness of the nicotine while reinforcing its effects. Id., 523. Lowering nicotine levels below those naturally occurring could be achieved through various processes whereby the nicotine is extracted from the tobacco leaf and added back at the desired level. The defendant understood that increasing the free nicotine would enhance the addictive properties of Salem cigarettes, while decreasing the nicotine yield of the cigarettes would increase the number of cigarettes needed to meet the smoker's addiction demand. Id.

The fact that the smoker would need to smoke more cigarettes to satisfy his or her addiction had two obvious consequences. First, the smoker would purchase more cigarettes. Second, the smoker would be exposed to more carcinogens, specifically, "tar." Id. " 'Tar' " is the tobacco industry term for all byproducts of smoking other than water and nicotine. Id. Tar yield is affected by numerous factors, including the type of filter, the type of paper, how the paper is ventilated, the length and composition of the cigarette, and the blend of the tobacco. Id.

By the early 1970s, the defendant had lowered the nicotine yield in Salem cigarettes from its 1956 level of

3.1 milligrams to 1.3 milligrams—a level determined to be optimal to maintain addiction. Id. At that time, Salem cigarettes contained fifteen to nineteen milligrams of tar, an amount that exceeded the level in its main competitor for menthol cigarettes, Kool. Id. The defendant had the capability of reducing the level of tar in its cigarettes to one milligram or less; in fact, two of its brands had two milligrams of tar in 1973. Id. Thus, the defendant manipulated the natural effect of nicotine through the use of additives, tobacco formulation, and other methods. In so doing, the defendant enhanced the addictive nature of the product, increased the number of cigarettes smoked by its consumer, and ultimately delivered a higher level of carcinogens to the consumer as compared to other cigarettes. Because the causal relationship between smoking and cancer is dose related, increasing the Salem smoker's exposure to carcinogens increased the likelihood of cancer. Id., 523–24.

The plaintiff began smoking in the early 1970s, when she was approximately twelve years old. She quickly became severely addicted, eventually smoking two to three packs of Salem cigarettes daily. Id., 524. Throughout the period when the plaintiff smoked, a warning from the Surgeon General of the United States that smoking is dangerous to one's health appeared on the packaging of Salem cigarettes. See id., 527 n.4.

In 1996, at age thirty-six and after smoking for twenty-five years, the plaintiff was diagnosed with cancer of the larynx. Id., 524. A person with the plaintiff's smoking history has between a 6.9 and 20 times greater chance of developing laryngeal cancer than a nonsmoker. Id. To treat her cancer, the plaintiff's larynx was removed and she received radiation. In 1997, the plaintiff quit smoking. She is cancer free, but continues to have various disabilities and problems related to her laryngectomy. Id.

After the plaintiff's cancer diagnosis and treatment, she commenced the present product liability action in federal court under theories of strict liability and negligent design.[5] At trial, the crux of the factual dispute was whether the defendant had designed and manufactured a tobacco product with heightened addictive properties that delivered more carcinogens than necessary. Id., 520. In addition to denying that allegation, the defendant also argued that the product "defect" identified by the plaintiff was merely the inherent risk common to all tobacco products insofar as all cigarettes contain nicotine and carcinogens. Id. As such, the defendant characterized the plaintiff's action as impermissibly claiming that cigarettes generally are unreasonably dangerous, in contravention to the proviso in comment (i) to § 402A of the Restatement (Second) that "[g]ood tobacco" (i.e., an ordinary, unadulterated cigarette) is not unreasonably dangerous. The defendant made a related claim that the determination whether Salem

cigarettes are unreasonably dangerous is exclusively governed by the ordinary consumer expectation test, as defined by comment (i) to § 402A, not the modified consumer expectation test that the plaintiff sought to apply. Id., 527. The defendant argued that application of the modified consumer expectation test would be improper because that test (a) only applies to products based on complex designs, which it claimed cigarettes are not, and (b) is conflict preempted by federal law because it could yield a result that in effect would require cigarette manufacturers to cease production to avoid liability, in contravention of Congress' decision to permit the sale of tobacco products. Id., 537.

The District Court rejected these claims in prejudgment and postjudgment motions. With respect to the plaintiff's theory of the case, the court concluded that the plaintiff's claim alleged, and the evidence demonstrated, that Salem cigarettes are uniquely designed and manufactured in such a way to make that product different from other cigarettes. Id., 526 n.3. With respect to the governing law, the court concluded that, although Connecticut derives an essential definition for product liability actions from comment (i) to § 402A of the Restatement (Second), there is no evidence that Connecticut has adopted the limitations in comment (i), including "[g]ood tobacco." Id., 536. The court further concluded that the jury properly could be instructed on the modified consumer expectation test. The court reasoned that this test was appropriate because the evidence demonstrated the complex design of cigarettes and the potential inability of the ordinary consumer (a beginner smoker, often a youth or minor) to form proper safety expectations. Id., 537. Finally, the court concluded that a verdict for the plaintiff on that test under the plaintiff's theory of the case would not amount to a ban on all cigarettes given the evidence of the unique design of Salem cigarettes. Id.

Ultimately, the court decided to instruct the jury on both the ordinary and modified consumer expectation tests as alternative bases for liability. Id., 527, 535–36. In its instructions applicable to both tests, the District Court cautioned: "For [the] plaintiff to meet her burden of proving . . . that Salem . . . cigarettes are defective, she must show that the Salem . . . cigarettes were 'unreasonably dangerous' to her, the user. . . . With respect to cigarettes in general, I instruct you that cigarettes are not defective merely because nicotine and/or carcinogenic substances may be inherent in the tobacco from which such cigarettes are manufactured." Id., 535. The jury returned a verdict in favor of the plaintiff, finding the defendant liable for both strict liability and negligent design.[6] The verdict form did not indicate whether the jury's strict liability verdict was premised on the ordinary consumer expectation test or the modified consumer expectation test.

In accordance with the defendant's request, the jury assessed comparative responsibility for the plaintiff's injuries, attributing 42 percent to the plaintiff and 58 percent to the defendant. After reducing the damages in accordance with the verdict, the District Court rendered judgment in the plaintiff's favor in the amount of $7,982,250 in compensatory damages, as well as punitive damages and offer of judgment interest.[7]

The defendant appealed to the Second Circuit, renewing, inter alia, its claim that the plaintiff's product liability cause of action is foreclosed by comment (i) to § 402A of the Restatement (Second) because comment (i) precludes liability of a seller of good tobacco. Because the Second Circuit deemed Connecticut law to be unsettled regarding this matter, it certified a question of law to this court regarding the preclusive effect of comment (i) on a strict product liability claim.

Before this court, the plaintiff argues: (1) the ordinary consumer expectation test, on which both comment (i) to § 402A and its good tobacco example are predicated, has been superseded as a matter of Connecticut law in favor of the modified consumer expectation test, under which consumer expectations are but one factor in assessing liability; (2) even under the ordinary consumer expectation test, the good tobacco exception in comment (i) to § 402A is limited to raw tobacco and does not require proof of "adulteration" or "contamination" of the cigarettes; and (3) public policy considerations militate against applying comment (i) to § 402A in a manner that would immunize cigarette manufacturers from strict liability for design defects. In response, the defendant contends that, because the only question before this court is whether comment (i) to § 402A precludes an action against a cigarette manufacturer premised on an unadulterated cigarette, a question that arises in connection with the ordinary consumer expectation test, the plaintiff's argument relating to the modified consumer expectation test is outside the scope of the certified question and should not be addressed. Moreover, it contends that the modified test is an improper test for unadulterated, generic cigarettes. As to the ordinary consumer expectation test that it claims should govern, the defendant contends that, because the addictive and cancer causing properties of cigarettes have been well-known since at least the 1960s, jurisdictions espousing the standard in comment (i) to § 402A have routinely dismissed claims predicted on such alleged defects and this court should conclude likewise.

I

To resolve these competing contentions, it is necessary to provide some background on the development of Connecticut's strict product liability law. In 1965, Connecticut became one of the first jurisdictions to

adopt, as a matter of state common law, § 402A of the Restatement (Second) of Torts, which had been adopted the previous year by the American Law Institute. See *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 214, citing *Garthwait* v. *Burgio*, 153 Conn. 284, 289–90, 216 A.2d 189 (1965). Section 402A recognized an action for strict product liability in tort without the requirement of privity between the seller and the consumer or proof of manufacturer fault. See *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 210–11; Restatement (Third), Torts, Products Liability, introduction, p. 3 (1998). The elements of a strict liability action that this court derived from § 402A required the plaintiff to prove: "(1) the defendant was engaged in the business of selling the product; (2) *the product was in a defective condition unreasonably dangerous to the consumer or user*; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition." (Emphasis added.) *Giglio* v. *Connecticut Light & Power Co.*, 180 Conn. 230, 234, 429 A.2d 486 (1980); accord *Rossignol* v. *Danbury School of Aeronautics, Inc.*, 154 Conn. 549, 562, 227 A.2d 418 (1967); *Garthwait* v. *Burgio*, supra, 289.

This court derived our definition of unreasonably dangerous, the second element of our strict liability test, from comment (i) to § 402A of the Restatement (Second): "To be considered unreasonably dangerous, the article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." (Internal quotation marks omitted.) *Slepski* v. *Williams Ford, Inc.*, 170 Conn. 18, 23, 364 A.2d 175 (1975), quoting 2 Restatement (Second), supra, § 402A, comment (i), p. 352; accord *Giglio* v. *Connecticut Light & Power Co.*, supra, 180 Conn. 234. This definition eventually came to be known under our law as the ordinary consumer expectation test. See *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 222.

Although our courts repeatedly have applied this definition, they have never referred to the related explanation or illustrations in comment (i) to § 402A. Comment (i) to § 402A of the Restatement (Second) of Torts provides in full: "The rule stated in this [s]ection applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. This is not what is meant by 'unreasonably dangerous' in this [s]ection. The article sold must be dangerous to an extent beyond that which

would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. Good whiskey is not unreasonably dangerous merely because it will make people drunk, and is especially dangerous to alcoholics; but bad whiskey, containing a dangerous amount of fusel oil, is unreasonably dangerous. *Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous.* Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous." (Emphasis added.)

To place comment (i) in its proper context, it is important to recognize that § 402A was adopted at a time when products liability historically had focused on manufacturing defects, particularly with respect to food safety issues, before design defects and inadequate safety warnings had become well established theories of strict product liability. See *Blue* v. *Environmental Engineering, Inc.*, 215 Ill. 2d 78, 89, 828 N.E.2d 1128 (2005) ("[h]istorically, the focus of products liability law was initially on manufacturing defects"); V. Schwartz, "The Restatement, Third, Torts: Products Liability: A Model of Fairness and Balance," 10 Kan. J.L. & Pub. Policy 41, 42 (2000) ("None of the cases cited in support of § 402[A] discussed design liability. All of the cases concerned products that were mismanufactured."); 1 D. Owen & M. Davis, Products Liability (4th Ed. 2014) § 8.3, pp. 712–14 (explaining historical development of rule in light of defective food products); see also Restatement (Third), supra, introduction, p. 3 ("[§] 402A had little to say about liability for design defects or for products sold with inadequate warnings"). This focus is reflected in the examples given in comment (i) of unreasonably dangerous products, i.e., contaminated butter or mismanufactured whiskey.[8]

In 1979, our legislature adopted our product liability act. See Public Acts 1979, No. 79-483. That liability act required all common-law theories of product liability to be brought as a statutory cause of action. See General Statutes § 52-572n. However, the liability act neither expressly codified our common-law definition of defective product under § 402A and comment (i) nor supplanted it with its own definition. But see General Statutes § 52-572q (providing elements for failure to warn defect). A significant change under the liability act was the adoption of comparative responsibility in lieu of contributory fault, so that a plaintiff's recovery could be reduced in proportion to his or her responsibility for the injury but not barred, no matter how high the degree of fault. See General Statutes §§ 52-572*l* and 52-572o, legislatively overruling *Hoelter* v. *Mohawk Service, Inc.*, 170 Conn. 495, 505–506, 365 A.2d 1064 (1976)

(importing contributory negligence concept and applying it to strict product liability).

As product liability jurisprudence began to develop beyond its historical focus to include design defects and failure to warn defects, many jurisdictions found the ordinary consumer expectation test to be an inadequate tool. See Restatement (Third), supra, § 1, comment (a), pp. 6–7 ("it soon became evident that § 402A, created to deal with liability for manufacturing defects, could not appropriately be applied to cases of design defects or defects based on inadequate instructions or warnings"). Most obviously, one could not simply compare the defective product to others in the product line to make an objective assessment of the consumer's expectations of the product. See id., § 2, comment (a), pp. 15–16 ("In contrast to manufacturing defects, design defects and defects based on inadequate instructions or warnings are predicated on a different concept of responsibility. . . . [S]uch defects cannot be determined by reference to the manufacturer's own design or marketing standards because those standards are the very ones that plaintiffs attack as unreasonable. Some sort of independent assessment of advantages and disadvantages, to which some attach the label 'risk-utility balancing,' is necessary."); *Ford Motor Co.* v. *Pool*, 688 S.W.2d 879, 881 (Tex. App. 1985) ("Manufacturing defect cases involve products which are flawed, i.e., which do not conform to the manufacturer's own specifications, and are not identical to their mass-produced siblings. The flaw theory is based upon a fundamental consumer expectancy: that a mass-produced product will not differ from its siblings in a manner that makes it more dangerous than the others. Defective design cases, however, are not based on consumer expectancy, but on the manufacturer's design of a product which makes it unreasonably dangerous, even though not flawed in its manufacture."), aff'd in part and rev'd in part on other grounds, 715 S.W.2d 629 (Tex. 1986).

For this and other reasons principally related to problems of proof, many jurisdictions adopted a multifactor "risk-utility" balancing test for design defect cases in lieu of, or in addition, to the consumer expectation test. See, e.g., *Caterpillar Tractor Co.* v. *Beck*, 593 P.2d 871, 884 (Alaska 1979); *Barker* v. *Lull Engineering Co.*, 20 Cal. 3d 413, 435, 573 P.2d 443, 143 Cal. Rptr. 225 (1978); *Armentrout* v. *FMC Corp.*, 842 P.2d 175, 183 (Colo. 1992) (en banc); *Radiation Technology, Inc.* v. *Ware Construction Co.*, 445 So. 2d 329, 331 (Fla. 1983); *Ontai* v. *Straub Clinic & Hospital, Inc.*, 66 Haw. 237, 243, 659 P.2d 734 (1983); *Lamkin* v. *Towner*, 138 Ill. 2d 510, 529, 563 N.E.2d 449 (1990); *Thibault* v. *Sears, Roebuck & Co.*, 118 N.H. 802, 807–809, 395 A.2d 843 (1978); *Turner* v. *General Motors Corp.*, 584 S.W.2d 844, 848 (Tex. 1979); see also 1 D. Owen & M. Davis, supra, § 8.15, p. 762 ("during the 1980s . . . the consumer expectation

test gradually lost ground to risk-utility in their battle for supremacy as independent tests of design defectiveness" [footnote omitted]). When the Restatement (Third) of Torts was adopted by the American Law Institute in 1997, it deemed the consumer expectation test inappropriate for design defects and abandoned that test in favor of a risk-utility test that focused on the availability of a feasible, safer alternative. Restatement (Third), supra, § 2 (b); id., § 2, comment (g), pp. 27–28. Under the Restatement (Third) of Torts and the various jurisdictions' risk-utility tests, consumer expectations were a relevant, but not necessarily dispositive, consideration in determining whether there was a design defect. Restatement (Third), supra, § 2, comment (d), p. 20; id., § 2, reporters' note, comment (d) (IV) (C), pp. 84–87.

In 1997, in *Potter*, this court considered the viability of our ordinary consumer expectation test for design defect cases. See *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 206–23. The defendants in that case had requested that the court abandon that test for such cases in favor of the risk-utility test in the second tentative draft of the Restatement (Third) of Torts.[9] Id., 215. The court declined to adopt the test in the draft Restatement (Third). Id., 217–19. The court viewed an absolute requirement of proof of a feasible alternative design to impose an undue burden on plaintiffs and to preclude claims that should be valid even in the absence of such proof. Id., 217–18.

Although the court in *Potter* maintained its allegiance to § 402A, it acknowledged criticisms of the ordinary consumer expectation test and decided that some change in our law was necessary because that test also could preclude relief for valid claims. Id., 219–20. In particular, the court pointed to the problem of complex products for which a consumer might not have informed safety expectations. Id., 219. The court was concerned, however, with shifting the focus to the conduct of the manufacturer and in turn abandoning strict liability. Id., 221–22. Accordingly, the court decided to adopt a test that would incorporate risk-utility factors into the ordinary consumer framework. Id., 220–21. Under the "modified" consumer expectation test, the jury would weigh the product's risks and utility and then inquire, in light of those factors, whether a "reasonable consumer would consider the product design unreasonably dangerous." Id., 221. The court's sample jury instruction incorporated the definition of unreasonably dangerous from comment (i) to § 402A of the Restatement (Second) and then provided a nonexclusive list of factors that could be used to determine what an ordinary consumer would expect.[10] Id., 221 n.15. "The availability of a feasible alternative design is a factor that a plaintiff may, rather than must, prove in order to establish that a product's risks outweigh its utility." Id., 221.

The court in *Potter* emphasized that it would "not require a plaintiff to present evidence relating to the product's risks and utility in every case. . . . There are certain kinds of accidents—even where fairly complex machinery is involved—[that] are so bizarre that the average juror, upon hearing the particulars, might reasonably think: Whatever the user may have expected from that contraption, it certainly wasn't that. . . . Accordingly, the ordinary consumer expectation test [would be] appropriate when the everyday experience of the particular product's users permits the inference that the product did not meet minimum safety expectations." (Citation omitted; internal quotation marks omitted.) Id., 222. In other words, the ordinary consumer expectation test would be appropriate when the incident causing injury is so bizarre or unusual that the jury would not need expert testimony to conclude that the product failed to meet the consumer's expectations. The court also indicated that instructions regarding both tests could be given to the jury, if supported by the evidence. Id., 223.

*Potter* was decided at a point in time when Connecticut design defect jurisprudence was not well developed. Indeed, as the present case illustrates, because actions under our liability act often have been brought in federal court, this court has had limited opportunities to do so. Subsequent case law and commentary has indicated that *Potter* was not clear as to when resort to each test would be appropriate and under what circumstances both tests properly could be submitted to a jury. See generally D. Fisher, "Connecticut's Jury Instruction on Design Defect Is Defective: A Second Look at *Potter* v. *Chicago Pneumatic Tool*," 84 Conn. B.J. 325 (2010) (complaining that *Potter* left uncertainties); J. Farley et al., "Recent Developments in Connecticut Products Liability Law: Breaking New Ground in Design Defect Cases," 73 Conn. B.J. 41, 41–44 (1999) (same); compare *Savage* v. *Scripto-Tokai Corp.*, 266 F. Supp. 2d 344, 350 (D. Conn. 2003) (rejecting defendant's argument that, in Connecticut, ordinary products are subject to ordinary test, while complex products may be subject to modified test, as "a misreading of *Potter*"), with *Moss* v. *Wyeth, Inc.*, 872 F. Supp. 2d 162, 166 (D. Conn. 2012) (limiting modified test to complex products), *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, supra, 806 F. Supp. 2d 527, 537 (treating modified test as standard for complex product designs), and *Netherlands Ins. Co.* v. *Tin Ceiling Xpress, Inc.*, Superior Court, judicial district of Windham, Docket No. CV-12-6005760-S, 2014 WL 7495053, *3 (October 30, 2014) (equating modified test to malfunction theory). The present case is a paradigmatic example of the confusion left in *Potter*'s wake. The defendant contends that, under *Potter*, only the ordinary consumer expectation test applies to the present case because the modified test is limited to complex designs for which consumers lack safety expectations. The

plaintiff contends that, under *Potter*, the modified consumer expectation test is the default test with the ordinary test limited to res ipsa type cases, in which the consumer's minimum expectations of the product have not been met. We have not been presented with an opportunity since *Potter* to address squarely our design defect standards. We therefore take this opportunity to revisit *Potter* and dispel the ambiguity created by it, with the advantage of hindsight informed by almost two decades of subsequent developments in product liability law.[11]

## II

At the outset, we address the defendant's contention that our analysis must be limited to the ordinary consumer expectation test because the modified consumer expectation test falls outside of the scope of the certified question. Simply put, we disagree. The certified question asks: "Does [comment (i) to § 402A] preclude a suit premised on strict products liability against a cigarette manufacturer based on evidence that the defendant [designed] cigarettes to increase daily consumption without regard to the resultant increase in exposure to carcinogens, but in the absence of evidence of adulteration or contamination?" As we have explained in part I of this opinion, § 402A of the Restatement (Second) is the governing standard for both tests and the definition in comment (i) of unreasonably dangerous plays a role in each test. See *D'Ascanio* v. *Toyota Industries Corp.*, 309 Conn. 663, 673 n.5, 72 A.3d 1019 (2013) (citing standard under § 402A as governing all strict product liability actions); see also *Reed* v. *Tiffin Motor Homes, Inc.*, 697 F.2d 1192, 1197 (4th Cir. 1982) (risk-utility test "finds its roots in [c]omment [i] to § 402A"). Even if, however, the modified consumer expectation test did not fall within the scope of the certified question, we may reformulate a question certified to us. See General Statutes § 51-199b (k). Pursuant to § 51-199b (f) (3), the Second Circuit invited us to modify the question as necessary or answer other questions that we deem relevant. See *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, supra, 731 F.3d 169. Accordingly, it is proper for us to consider the scope and application of the modified consumer expectation test as it bears on our resolution of the present case.

For the reasons set forth subsequently, we reach the following conclusions regarding the standards for a strict product liability action based on defective design generally and in the present case. Under *Potter*, the modified consumer expectation test is our primary test. The ordinary consumer expectation test is reserved for cases in which the product failed to meet the ordinary consumer's *minimum* safety expectations, such as res ipsa type cases. A jury could not reasonably conclude that cigarettes that cause cancer fail to meet the consumer's minimum safety expectations. Therefore, the

plaintiff was required to proceed under the modified consumer expectation test. Comment (i) to § 402A of the Restatement (Second) does not present a per se bar to recovery under the modified consumer expectation test. Accordingly, the answer to the certified question is "no."

To begin, we acknowledge that there is language in *Potter*, as well as in subsequent Connecticut case law, that could support each of the following interpretations of our strict liability standards for design defects: (1) the ordinary consumer expectation test is the primary test, with the modified consumer expectation test reserved exclusively for complex product designs for which an ordinary consumer could not form safety expectations (simple/complex divide); (2) the modified consumer expectation test is the default test, with the ordinary consumer expectation test reserved for products that fail to meet minimum safety expectations; and (3) a plaintiff may elect to proceed under either test or both tests, such that, even if the claim fails under the ordinary consumer expectation test, the plaintiff may prevail under the modified consumer expectation test with the assistance of expert testimony.[12]

We are not persuaded that *Potter* intended to draw a simple/complex divide. The court in *Potter* pointed to the problem in proving consumers' safety expectations for complex products because that concern was implicated in the case before the court and was the most obvious misfit for the ordinary consumer expectation test. *Potter* involved pneumatic hand tools alleged to be defective because they exposed users to excessive vibration, which in turn caused permanent vascular and neurological damage to the users' hands. *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 202–204. The plaintiffs relied on expert testimony from various engineers and industry standards to prove their case.[13] Id., 204–206. Notably, although concerns about proof for complex products was foremost in the court's mind when adopting the modified test, the court stated no limitations on the circumstances in which that test could be applied. Instead, all of the limitations discussed were in reference to the application of the ordinary consumer expectation test. See id., 222–23 (The court cited to bizarre accidents as examples of when resort to the ordinary consumer test would be appropriate, and noted: "[T]he jury should engage in the risk-utility balancing required by our modified consumer expectation test when the particular facts do not reasonably permit the inference that the product did not meet the safety expectations of the ordinary consumer. . . . Furthermore, instructions based on the ordinary consumer expectation test would not be appropriate when, as a matter of law, there is insufficient evidence to support a jury verdict under that test. . . . In such circumstances, the jury should be instructed solely on the modified consumer expectation test we have articu-

lated today." [Citations omitted.]).

Moreover, a simple/complex divide would not be ideal because the line between these categories is not always clear. See id., 269 n.2 *(Berdon, J.,* concurring) (criticizing majority for failure to provide such guidance); D. Fisher, supra, 84 Conn. B.J. 333 ("it would be helpful to provide guidance as to *how* the court decides whether a case is 'complex' or 'simple' " [emphasis in original]). Indeed, one could readily categorize the defendant's Salem cigarettes as a complex product because of the hundreds of ingredients incorporated into Salem cigarettes, as well as the myriad physical, chemical and biochemical variables that were considered in designing that product. Cf. *Evans* v. *Lorillard Tobacco Co.*, 465 Mass. 411, 428, 990 N.E.2d 997 (2013) (noting that evidence established that cigarette is "highly engineered product"); *Smith* v. *Brown & Williamson Tobacco Corp.*, 275 S.W.3d 748, 796 (Mo. App. 2008) (same). Alternatively, one could view the defendant's cigarettes as a simple product if characterized as nothing more than a nicotine delivery system that carries a known risk of causing cancer.

We observe that other jurisdictions that apply both a consumer expectation test and a risk-utility test have rejected the simple/complex divide. See, e.g., *Mikolajczyk* v. *Ford Motor Co.*, 231 Ill. 2d 516, 528–41, 901 N.E.2d 329 (2008) (rejecting argument that risk-utility test is only test to be applied if product is complex and if injury occurred in circumstances unfamiliar to average consumer and that consumer expectation test is reserved for cases involving simple products or everyday circumstances); *Calles* v. *Scripto-Tokai Corp.*, 224 Ill. 2d 247, 250, 864 N.E.2d 249 (2007) ("In Illinois, two tests are employed when determining whether a product is unreasonably dangerous under a strict liability design-defect theory—the consumer-expectation test and the risk-utility test. In this case, we are asked to consider whether there is a 'simple product' exception to the application of the risk-utility test. That is, we must decide whether a product which is deemed 'simple' and its dangers 'open and obvious' will be per se exempt from the risk-utility test and subject only to the consumer-expectation test. We decline to adopt such a per se rule."); see also *Soule* v. *General Motors Corp.*, 8 Cal. 4th 548, 568–69, 882 P.2d 298, 34 Cal. Rptr. 2d 607 (1994) (The court rejected the defendant's argument "that the consumer expectations test is improper whenever . . . a complex product, or technical questions of causation are at issue. Because the variety of potential product injuries is infinite, the line cannot be drawn as clearly as [the defendant] proposes. But the fundamental distinction is not impossible to define. The crucial question in each individual case is whether the circumstances of the product's failure permit an inference that the product's design performed below the legitimate, commonly accepted minimum safety assumptions of its

ordinary consumers."); *Soule* v. *General Motors Corp.*, supra, 570 (explaining that risk-utility test was only proper test in that case, not because product was complex but because jury required expert testimony to determine whether product was not reasonably safe).

Although some of the shortcomings of the ordinary consumer expectation test have been best illustrated in relation to complex designs, the concerns with this test have never been limited to such designs. See, e.g., J. Beasley, Products Liability and the Unreasonably Dangerous Requirement (1981) p. 88 (asserting that consumer expectation test has "little logical application to new products, where no expectation of safety may have developed, or to obscure products with a limited market, where the number of consumers is not conducive to a clear consensus," and also noting opposite problem, that "if an entire industry rejects a safe design and uses an unsafe one, the unsafe one may have become expected"); see also S. Birnbaum, "Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence," 33 Vanderbilt L. Rev. 593, 613–15 (1980) (discussing generally applicable concerns with ordinary consumer expectation test). One significant concern has been that the ordinary consumer expectation test, which deems unreasonable only those dangers that would not be anticipated by an ordinary consumer, could preclude recovery whenever a product's dangers were open and obvious. W. Keeton et al., Prosser and Keeton on the Law of Torts (5th Ed. 1984) § 99, pp. 698–99; A. Weinstein et al., Products Liability and the Reasonably Safe Product (1978) pp. 45–46 ("The difficulty with [the ordinary consumer expectation] test is that it suggests that a manufacturer has fulfilled all his duties to the consumer if the product's dangers are open and obvious. In many instances manufacturers have been absolved from liability when an obvious danger caused serious injury, even though that injury could have been averted by a design modification that would not have added significantly to the cost of the product or impaired its usefulness.").

The court in *Potter* had no occasion to address this concern. Nonetheless, it is evident that limiting the modified test to complex products for which the consumer could not form safety expectations would be antithetical to the public policies informing our product liability law. A consequence of such a limitation would be to immunize manufacturers even when they readily could have reduced or eliminated the product's danger. It could also immunize manufacturers for design decisions that increase the risk of known dangers, as in the present case. Our legislature's express rejection of comparative or contributory negligence as a bar to recovery in a strict liability action would be in tension with a sweeping immunity based solely on the consumer's knowledge. Cf. *Calles* v. *Scripto-Tokai Corp.*, supra, 224 Ill. 2d 262 (reaching same conclusion in light of

legislature's rejection of assumption of risk as bar to strict products liability). Moreover, *Potter* expanded our product liability tests to remove impediments to recovery.[14] Cf. 1 D. Owen & M. Davis, supra, § 8.4, pp. 715–16 ("[a]lthough the consumer expectations standard was conventionally viewed as more protective to plaintiffs than the risk-utility standard, it now is clear that courts have used the consumer expectations test most frequently to *deny* recovery to plaintiffs in cases involving obvious design hazards" [emphasis in original; footnote omitted]).

More fundamentally, providing such immunity would remove an important incentive to improving product safety. For this reason, there has been a clear and overwhelming trend in other jurisdictions to allow consumers to pursue defective product design claims despite open and obvious dangers, usually under a multifactor risk-utility test. See Restatement (Third), supra, § 2, reporters' note, comment (d) (IV) (C), pp. 84–87; see, e.g., *Barker* v. *Lull Engineering Co.*, supra, 20 Cal. 3d 425 ("we flatly rejected the suggestion that recovery in a products liability action should be permitted *only* if a product is more dangerous than contemplated by the average consumer, refusing to permit the low esteem in which the public might hold a dangerous product to diminish the manufacturer's responsibility for injuries caused by that product" [emphasis in original]); *Ogletree* v. *Navistar International Transportation Corp.*, 269 Ga. 443, 444, 500 S.E.2d 570 (1998) ("The overwhelming majority of jurisdictions have held that the open and obvious nature of the danger does not preclude liability for design defects. . . . Moreover, academic commentators are almost unanimous in their criticism of the rule." [Citations omitted.]); *Calles* v. *Scripto-Tokai Corp.*, supra, 224 Ill. 2d 262 (expressing concern that "[a]doption of a [per se] rule [excepting simple products with open and obvious dangers from analysis under the risk-utility test] would essentially absolve manufacturers from liability in certain situations even though there may be a reasonable and feasible alternative design available that would make a product safer, but which the manufacturer declines to incorporate because it knows it will not be held liable"); see also 1 D. Owen et al., Products Liability (3d Ed. 2000) § 8:3, p. 447 (consumer expectation test limited by open and obvious doctrine "perniciously rewards manufacturers for failing to adopt cost-effective measures to remedy obviously unnecessary dangers to human life and limb"); J. Beasley, supra, p. 89 ("One of the greatest dangers of the [c]omment [i] [to § 402A] standard is that it encourages the perpetuation of poor manufacturing and design practices. The more uniformly a certain shoddiness is allowed to go unrestrained, the more it comes to be expected. . . . The trouble with a 'consumer expectation' test is that it allows an industry to set its own standards with no

check upon its own self-interest.").

Making the modified consumer expectation test our default test for design defect claims, and reserving the ordinary consumer expectation test for those products that fail to meet legitimate, commonly accepted minimum safety expectations, provides a safety incentive that is consonant with our state's public policies. Moreover, such a framework is the only one that can be reconciled with this court's direction in *Potter* that the jury could be instructed on both tests if supported by the evidence. Allowing the jury to consider both tests is only logical if the standard, and not merely the nature of proof, differs under each test. If the two tests were merely alternative methods of proving the same standard—the product failed to meet the ordinary consumer's expectations—then a jury's verdict that this standard was not met under one test could not logically be reconciled with a verdict that this standard was met under the other test. Either the product met the ordinary consumer's expectations, or it did not. If, however, one test sets the floor for recovery—a product that meets *minimum* safety expectations—then a verdict for the defendant on that test logically could be reconciled with a plaintiff's verdict on a test that sets a higher standard. Cf. *Barker* v. *Lull Engineering Co.*, supra, 20 Cal. 3d 426 n.7 ("The flaw in the . . . analysis [of the Restatement (Second)] . . . is that it treats such consumer expectations as a 'ceiling' on a manufacturer's responsibility under strict liability principles, rather than as a 'floor.' . . . [P]ast . . . decisions establish that at a minimum a product must meet ordinary consumer expectations as to safety to avoid being found defective." [Emphasis omitted.]). In other words, a product might meet the consumer's minimum safety expectations because the product's dangers are known or obvious but nonetheless be defective because it could have been designed to be less dangerous without unreasonably compromising cost or utility (e.g., a table saw lacking a safety guard). See id., 430 ("a product may be found defective in design, even if it satisfies ordinary consumer expectations, if through hindsight the jury determines that the product's design embodies 'excessive preventable danger,' or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design").[15]

Accordingly, we hold that, under our product liability law, the ordinary consumer expectation test is reserved for those limited cases in which a product fails to meet a consumer's legitimate, commonly accepted minimum safety expectations. Expert testimony on product design is not needed to prove the product's defect, nor is the utility of the product's design an excuse for the undisclosed defect. See *Soule* v. *General Motors Corp.*, supra, 8 Cal. 4th 567 ("the consumer expectations test is reserved for cases in which the everyday experience

of the product's users permits a conclusion that the product's design violated minimum safety assumptions, and is thus defective regardless of expert opinion about the merits of the design" [emphasis omitted]); A. Twerski & J. Henderson, "Manufacturers' Liability for Defective Product Designs: The Triumph of Risk-Utility," 74 Brook. L. Rev. 1061, 1108 (2009) ("overwhelming majority of cases that rely on consumer expectations as the theory for imposing liability do so only in res ipsa-like situations in which an inference of defect can be drawn from the happening of a product-related accident"). All other cases should be determined under the modified consumer expectation test.

With this clarification of our law, it is evident that the plaintiff in the present case properly could proceed only under the modified consumer expectation test. A cigarette that exposes the user to carcinogens and the attendant risk of cancer cannot be said to fail to meet an ordinary consumer's legitimate, commonly accepted minimum safety expectations.[16] To establish the defect, the plaintiff's case required expert testimony on cigarette design and manufacture, as well as the feasibility of an alternative design. The defendant contends, however, that applying the modified consumer expectation test to cigarettes would be improper because it would effectively result in a de facto ban on cigarettes, in violation of our legislature's "ratifi[cation]" of this court's adoption of comment (i) to § 402A in our product liability act and Congress' declaration that cigarettes are a legal product. See *Food & Drug Administration* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 136–37, 120 S. Ct. 1291, 146 L. Ed. 2d 121 (2000) (concluding that, because Congress had demonstrated that it foreclosed removal of tobacco products from market, Federal Drug Administration [FDA] was precluded from regulating tobacco products when FDA's statutory mandate would require it to ban them in light of its determination that such products cannot be made safe for intended use). We are not persuaded.

Our legislature did not ratify this court's previous adoption of comment (i) to § 402A when it enacted the liability act. Neither § 402A nor comment (i) is expressly or implicitly referenced in the liability act. Cf. S.C. Code Ann. § 15-73-30 (2005) ("[c]omments to § 402A of the Restatement of Torts, Second, are incorporated herein by reference thereto as the legislative intent of this chapter");[17] Wn. Rev. Code Ann. § 7.72.030 (3) (West 2007) ("[i]n determining whether a product was not reasonably safe under this section, the trier of fact shall consider whether the product was unsafe to an extent beyond that which would be contemplated by the ordinary consumer"). *Potter* plainly reflects this court's understanding that, except where preempted by the liability act, the legislature left the development of product liability standards to the common law. The court would have been required to reject the defendant's

request in *Potter* to adopt the Restatement (Third) standard had the legislature effectively codified comment (i) to § 402A of the Restatement (Second). Instead, the court rejected the Restatement (Third) standard after considering its merits.

With regard to the defendant's preemption argument, we have two responses. Insofar as this argument implicates federal preemption and evidentiary issues, we believe such matters should be resolved by the Second Circuit. Insofar as the defendant contends that application of the modified consumer expectation test to circumstances like the present case could effectively allow a jury to ban commonly used and useful products, thus usurping our legislature's authority over such matters, we find such concerns too speculative to warrant a contrary rule. We have every confidence that the possibility of such outlier verdicts could be addressed through a motion for judgment notwithstanding the verdict. Cf. *Calles* v. *Scripto-Tokai Corp.*, 358 Ill. App. 3d 975, 982, 832 N.E.2d 409 (2005) ("in very extreme cases [i.e., products with very low production costs], courts may make the determination that the cost-benefit analysis under the risk-utility test strongly favors the manufacturer and there is no need to send the case to [the] jury because no reasonable jury could find for the plaintiff" [internal quotation marks omitted]), aff'd, *Calles* v. *Scripto-Tokai Corp.*, 224 Ill. 2d 247, 864 N.E.2d 249 (2007); *Hernandez* v. *Tokai Corp.*, 2 S.W.3d 251, 261 (Tex. 1999) ("the issue of whether the product is unreasonably dangerous as designed may nevertheless be a legal one if reasonable minds cannot differ on the risk-utility analysis considerations").

Finally, we note that other jurisdictions applying some form of risk-utility test to design defect claims against cigarette manufacturers have found no impediment to the application of that test if the plaintiff identifies some defect specific to the cigarette brand(s) at issue and/or a reasonably safer alternative.[18] See *Philip Morris USA, Inc.* v. *Arnitz*, 933 So. 2d 693, 695 (Fla. App.) (affirming judgment in favor of plaintiff on design defect theory based on claim that, while plaintiff knew that smoking posed health risk, consumers did not know of increased risk posed by defects in product where manufacturer: used additives or flavorants to overcome body's natural defenses to inhaling smoke, thus making cigarettes easier to inhale; used as many as 110 to 115 total additives and that some additives changed form of nicotine to freebase nicotine, which can lead to greater nicotine addiction; and used " 'flue-cured' " tobacco, which increased level of carcinogenic tobacco specific nitrosamines in tobacco), review denied, 946 So. 2d 1071 (Fla. 2006); *Evans* v. *Lorillard Tobacco Co.*, supra, 465 Mass. 428–29, 431 (The court affirmed the verdict for the plaintiff who established that cigarettes are a highly engineered product, that the defendant manipulated its product to give smokers

particular doses of tar and nicotine, that the defendant maintained the addictive level of nicotine, and that the plaintiff had proposed as a reasonable alternative a cigarette without menthol in which the carcinogens in the tar are at a level that is relatively safe and where the level of nicotine is nonaddictive. "We do not accept [the defendant's] implicit suggestion that every cigarette, to be a cigarette, must contain levels of tar that cause a high risk of cancer and levels of nicotine that are addictive."); *Haglund* v. *Philip Morris, Inc.*, Docket No. 012367C, 2009 WL 3839004, *1, 3, 9–10 (Mass. Super. October 20, 2009) (The court denied a motion for summary judgment, applying a feasible, safer alternative design test under § 2 of the Restatement [Third] of Torts under an implied warranty theory, where the plaintiff alleged that the defendant manipulated nicotine levels via cigarette construction technology and tobacco blend selection, increasing free nicotine and increasing inhalability through tobacco processing, including the specification of flavorants, additives and smoke chemistry. The jury must weigh the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.); *Smith* v. *Brown & Williamson Tobacco Corp.*, supra, 275 S.W.3d 796 (jury that was not limited in factors to determine if defective product unreasonably dangerous properly returned verdict for plaintiff where evidence went beyond categorical attack on danger of cigarettes in general and instead demonstrated specific design choices that had potential to affect plaintiff's health during time period she smoked, including evidence that cigarettes were highly engineered product, different from other cigarettes, contained menthol to numb throat and make it easier to inhale more deeply and allowed more nicotine to be delivered to body); *Tomasino* v. *American Tobacco Co.*, 23 App. Div. 3d 546, 548–49, 807 N.Y.S.2d 603 (2005) (concluding that defendants' motions for summary judgment were properly denied and rejecting their contention that they were entitled to judgment because cigarettes were in condition reasonably contemplated by ultimate consumer); *Miele* v. *American Tobacco Co.*, 2 App. Div. 3d 799, 801, 805, 770 N.Y.S.2d 386 (2003) (The court reversed the lower court's ruling granting the defendants' motions for summary judgment because the evidence that "the tobacco companies opted not to develop, pursue, or exploit available technologies to reduce the toxins in cigarettes which cause disease, sufficed to raise an issue of fact as to whether the foreseeable risk of harm posed by cigarettes could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer respondents. It is ineluctable that, based upon the evidence presented by the plaintiff, a jury may determine that the tobacco companies' objective was to entrap the cigarette smoker to preserve and enhance their eco-

nomic objectives."); *Semowich* v. *R.J. Reynolds Tobacco Co.*, Docket No. 86-CV-118, 1988 WL 86313, *3–4 (N.D.N.Y. August 18, 1988) (rejecting defendant's argument that comment [i] to § 402A of the Restatement [Second] precluded plaintiff's claim because, to extent that comment [i] suggests cigarettes cannot be defective, it does not represent New York law, but noting that plaintiff must present evidence that product, as designed, was not reasonably safe because there was substantial likelihood of harm and it was feasible to design product in safer manner).

Finally, we turn to the question of whether comment (i) to § 402A of the Restatement (Second) is a per se bar to the plaintiff's recovery under the modified consumer expectation test. We conclude that it is not.

Comment (i) to § 402A serves a limited role under the modified consumer expectation test. Although the modified test asks the jury to weigh various factors through the ultimate lens of the consumer's expectations, as a functional and practical matter that weighing process supplants the definition in comment (i) of unreasonably dangerous.[19] Cf. *Wright* v. *Brooke Group Ltd.*, 652 N.W.2d 159, 169–70 (Iowa 2002) (concluding that comment [i] to § 402A does not apply after court adopted risk-utility test). In other words, the factors that the court in *Potter* identified essentially provide the jury with information that a fully informed consumer would know before deciding whether to purchase the product. See *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 221. When the consumer has specific product expectations that differ from those factors, those too may be factored into the weighing process. It could be that, in a given case, the consumer's expectations of the product would be the determinative factor. See *Blue* v. *Environmental Engineering, Inc.*, supra, 215 Ill. 2d 87 ("[u]nder the risk-utility test, the open and obvious nature of the risk is just one factor to be considered within this range of considerations and it will only serve to bar the liability of the manufacturer where it outweighs all other factors to be considered in weighing the inherent risks against the utility of the product as manufactured"); *Delaney* v. *Deere & Co.*, 268 Kan. 769, 792–93, 999 P.2d 930 (2000) (rejecting open and obvious danger as precluding recovery and instead making that fact merely one of several informing consumer's expectations); *Evans* v. *Lorillard Tobacco Co.*, supra, 465 Mass. 428 (noting that under risk-utility test, "because reasonable consumer expectations are simply one of many factors that may be considered and not necessarily the determinative factor, the plaintiff was not obligated to prove that Newport cigarettes were more dangerous than consumers reasonably expected"); *Tomasino* v. *American Tobacco Co.*, supra, 23 App. Div. 3d 548–49 ("The mere fact that a risk presented by a product design is open and obvious, or generally known, and that the product thus satisfies

expectations . . . may substantially influence or even be ultimately determinative on risk-utility balancing in judging whether the omission of a proposed alternative design renders the product not reasonably safe. It follows that, while disappointment of consumer expectations may not serve as an independent basis for allowing recovery under [the design defect theory], neither may conformance with consumer expectations serve as an independent basis for denying recovery. Such expectations may be relevant in both contexts, but in neither are they controlling . . . ." [Citations omitted; internal quotation marks omitted.]).

To allow the ordinary consumer's awareness of the product's potential danger to preclude recovery as a matter of law, however, would make Connecticut an outlier and defeat our intention in relegating the ordinary consumer expectation test to a more limited role.[20] Indeed, irrespective of the incorporation of the definition of unreasonably dangerous from comment (i) to § 402A into the modified test, it would be contrary to the public policy of this state to incorporate the exceptions in comment (i) insofar as they would immunize a manufacturer from liability for manipulating the inherently dangerous properties of its product to pose a greater risk of danger to the consumer. See *Witherspoon* v. *Philip Morris, Inc.*, 964 F. Supp. 455, 466 (D.D.C. 1997) ("The infamous comment [i] following § 402A appears to be on very shaky ground currently. Attitudes and knowledge about cigarettes have changed immensely since the comment was written and there is at least some authority that comment [i] is no longer a reasonable explanation of unreasonably dangerous.").

We answer the certified question "no."

No costs shall be taxed in this court to either party.

In this opinion EVELEIGH, ROBINSON and VERTEFEUILLE, Js., concurred.

[1] Comment (i) to § 402A of the Restatement (Second) of Torts provides in relevant part: "The rule stated in this [s]ection applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. . . . Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous. . . ."

[2] Although not essential to our analysis, we note our interpretation of two phrases in the certified question: "purposefully manufactured" and "adulteration or contamination." First, we assume that the Second Circuit used "purposefully manufactured" to mean designed, thus distinguishing a design defect from a manufacturing defect. A manufacturing defect cannot be purposeful, and the plaintiff only proceeded under the theory of a design defect. A design defect occurs when the product is manufactured in conformity with the intended design but the design itself poses unreasonable dangers to consumers. Second, we assume that "adulteration or contamination" was intended to mean the inclusion of ingredients that are not found in other cigarette brands or that create a different danger than those commonly known to arise from use of that product. See, e.g., The American Heritage Dictionary of the English Language (5th Ed. 2011) (defining adulterate as "[t]o make impure by adding extraneous, improper, or inferior ingredients," and defining contaminate as "[t]o make impure or unclean; corrupt by contact or mixture"); Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (defining adulterate as "to corrupt, debase, or make impure by the addition of a foreign or inferior substance," and defining contaminate as

"to soil, stain, corrupt, or infect by contact or association . . . to make inferior or impure by admixture . . . to make unfit for use by the introduction of unwholesome or undesirable elements"). Although some courts have determined that chemical additives can render a cigarette "adulterated"; see, e.g., *Naegele* v. *R.J. Reynolds Tobacco Co.*, 28 Cal. 4th 856, 864–65, 50 P.3d 769, 123 Cal. Rptr. 2d 61 (2002); the Second Circuit could not have ascribed a similar meaning because there was evidence in the present case of scores of additives in the cigarette brand at issue. See footnote 4 of this opinion.

[3] Addiction liability refers to the percentage of people who try a drug and become addicted to it. According to evidence produced before the District Court, addiction liability for nicotine is approximately 80 to 85 percent. The level of addiction is impacted by various factors, including genetics, stress level, socioeconomic status, and age of initiation. See *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, supra, 806 F. Supp. 2d 521 n.2.

[4] The plaintiff introduced at trial a twenty-four page list of hundreds of additives used by the defendant in Salem's manufacture, among which were solvents, glue, and coolants, including Freon.

[5] In addition to her product liability claim, the plaintiff alleged a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., for unlawful youth marketing. The District Court granted the defendant's motion for judgment on that count, but considered evidence relating to youth marketing in rejecting the defendant's challenges to the verdict under the ordinary consumer expectation test. The judgment on the CUTPA count was not challenged on appeal to the Second Circuit.

[6] In light of this verdict, the plaintiff objected to the formulation of the certified question because she contended that comment (i) to § 402A of the Restatement (Second) applies only to product liability claims premised on strict liability and not to those premised on negligence. In another product liability action brought against a different cigarette manufacturer after the present case commenced, the United States District Court for the District of Connecticut certified questions to this court regarding whether comment (i) to § 402A applies to a product liability claim for negligence under our act as well as whether punitive damages awarded under that act are common-law punitive damages limited to litigation costs or statutory punitive damages. See *Bifolck* v. *Philip Morris*, *Inc.*, Docket SC 19310. That case has been argued and the decision is pending.

[7] The total amount of the judgment awarded to the plaintiff was $28,079,626.27, which, in addition to compensatory damages, included $3,970,289.87 in punitive damages, $15,777,352 in prejudgment offer of judgment interest, and $349,739.40 in postjudgment offer of judgment interest.

[8] Comment (i) to § 402A deems whiskey containing a dangerous amount of fusel oil to be unreasonably dangerous. Fusel oil is produced during alcoholic fermentation. 5 The New Encyclopaedia Britannica (15th Ed. 1998) p. 60. It is mildly toxic, but in small concentrations gives the whiskey flavor and body. A. Connelly, "The Science and Art of Whisky Making," The Guardian, August 27, 2010, available at http://www.theguardian.com/science/blog/2010/aug/23/science-art-whisky-making.

[9] The American Law Institute adopted the final version of the Restatement (Third) of Torts shortly after this court rendered its decision in *Potter*. As the concurring opinion explains, the Restatement (Third) made a point of responding to the criticism in *Potter* of its test and explaining how its final draft addressed those criticisms. See Restatement (Third), supra, § 2, reporters' note, comment (d) (II) (C), pp. 71–73.

[10] "Under this formulation, a sample jury instruction could provide: 'A product is unreasonably dangerous as designed, if, at the time of sale, it is defective to an extent beyond that which would be contemplated by the ordinary consumer. In determining what an ordinary consumer would reasonably expect, you should consider the usefulness of the product, the likelihood and severity of the danger posed by the design, the feasibility of an alternative design, the financial cost of an improved design, the ability to reduce the product's danger without impairing its usefulness or making it too expensive, and the feasibility of spreading the loss by increasing the product's price or by purchasing insurance, and such other factors as the claimed defect indicate are appropriate.' " *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 221 n.15.

[11] The concurring justices would go further and take this occasion to adopt the test in the Restatement (Third) of Torts. We decline to consider that issue in the present case principally because neither party sought to have the jury charged under the Restatement (Third) test, which would have

required the jury to make a finding that was not required under either of our current tests, namely, that there was a feasible, safer alternative. Although the plaintiff did present evidence on that matter, the jury was free to conclude that Salem cigarettes are unreasonably dangerous even if it did not credit that evidence. Therefore, we conclude that it is appropriate and sufficient in the present case to clarify the circumstances under which the existing tests apply rather than adopt a new legal standard.

[12] We note that our case law subsequent to *Potter* also recognizes the malfunction theory as a basis for establishing strict product liability. See *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 99 A.3d 1079 (2014); *Metropolitan Property & Casualty Ins. Co.* v. *Deere & Co.*, 302 Conn. 123, 25 A.3d 571 (2011). "The malfunction theory allows a plaintiff in a product liability action to rely on circumstantial evidence to support an inference that an unspecified defect attributable to a product seller was the most likely cause of a product malfunction when other possible causes of the malfunction are absent." *White* v. *Mazda Motor of America, Inc.*, supra, 612. This theory does not fall squarely within either the ordinary or modified consumer expectation test, but to some extent overlaps with both tests. See id., 622, 632–33 n.9. It applies when the product fails to perform as manifestly intended, which is at issue under the ordinary test, but expert testimony also may be required in certain cases, which is relevant under the modified consumer test. See id., 632 n.9 ("The malfunction theory is not an alternative to expert testimony, nor is it proven simply on the basis of the expectations of the consumer. The malfunction theory is an alternative to proving the existence of a specific defect that is based on the argument that a malfunction resulted from an unspecified defect in the product because there is no other reasonably possible cause of the malfunction. . . . In fact, we have made clear that many claims under the malfunction theory will require expert testimony." [Citation omitted.]). Because the defect is unspecified (and perhaps unspecifiable), it "does not depend on a design or manufacturing defect." Id., 633 n.9. Neither party claims that this theory applies to the present case, and we therefore need not address it.

[13] Although the plaintiffs' evidence and theory of the case set forth in *Potter* would seem to fall squarely within the purview of the modified consumer expectation test, we presume that the court in *Potter* analyzed the defendants' claim challenging the sufficiency of the evidence to establish a design defect under the ordinary consumer expectation test because: (a) it was the only standard recognized at the time of trial; (b) the modified consumer expectation test still asked the jury to decide whether the product failed to meet those expectations; and (c) the defendant had requested an instruction requiring the plaintiff to prove a feasible alternative design, a requirement that this court rejected. Therefore, we presume that the court in *Potter* implicitly adopted the modified consumer expectation test prospectively.

[14] We also note that precluding liability solely because the product's dangers were open and obvious would be in tension with this court's resolution of an issue in *Potter*. The court in *Potter* held that a jury may properly consider "state of the art" evidence—"the level of relevant scientific, technological and safety knowledge existing and reasonably feasible at the time of design"—in determining whether a product was defectively designed and unreasonably dangerous. *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 250. The court underscored that "state of the art refers to what is technologically feasible, rather than merely industry custom. . . . Obviously, the inaction of all the manufacturers in an area should not be the standard by which the state of the art should be determined. . . . Accordingly, [a] manufacturer may have a duty to make products pursuant to a safer design even if the custom of the industry is not to use that alternative." (Citations omitted; internal quotation marks omitted.) Id., 250–51. The fact that an industry universally may design a product in a manner that poses a particular danger may provide notice to consumers of such a danger. To preclude liability due to such notice would negate the evidentiary value of the state of the art.

[15] We note that Illinois avoids this problem through a different approach. That state allows the parties' theory of the case and evidence to dictate which test applies. If the evidence under either party's theory implicates the risk-utility test, that broader test, which incorporates the factor of consumer expectations, is the sole test to be applied by the finder of fact. See *Mikolajczyk* v. *Ford Motor Co.*, supra, 231 Ill. 2d 556. Thus, because Illinois does not allow a jury to make findings on both tests, there is no risk of an inconsistent verdict.

[16] We recognize that a different conclusion might be warranted in cases in which the plaintiff (or decedent) began smoking before warning labels were mandated by federal law. See *Guilbeault* v. *R.J. Reynolds Tobacco Co.*, 84 F. Supp. 2d 263, 271 (D.R.I. 2000) ("most of the courts considering the common knowledge of the general disease-related health risks of smoking have placed common knowledge at least at 1966 and some before"); see, e.g., *Tillman* v. *R.J. Reynolds Tobacco Co.*, 871 So. 2d 28, 33 (Ala. 2003); *Miele* v. *American Tobacco Co.*, 2 App. Div. 3d 799, 802, 770 N.Y.S.2d 386 (2003); *Spain* v. *Brown & Williamson Tobacco Corp.*, 363 F.3d 1183, 1194 (11th Cir. 2004); *Insolia* v. *Philip Morris, Inc.*, 216 F.3d 596, 600 (7th Cir. 2000); *Estate of White* v. *R.J. Reynolds Tobacco Co.*, 109 F. Supp. 2d 424, 432–33 (D. Md. 2000).

[17] We note that, even when a legislature has adopted the Restatement (Second) of Torts and identified its comments as legislative intent, a court has concluded that such action did not express an "intention to foreclose court consideration of developments in products liability law." *Branham* v. *Ford Motor Co.*, 390 S.C. 203, 220, 701 S.E.2d 5 (2010).

[18] Indeed, even in jurisdictions analyzing such claims under the consumer expectation test, courts have recognized that products liability actions properly may be brought against cigarette manufacturers if they have manipulated the product design to be more dangerous or have made their product different than other cigarettes. See *Hearn* v. *R.J. Reynolds Tobacco Co.*, 279 F. Supp. 2d 1096, 1106 (D. Ariz. 2003); *Thomas* v. *R.J. Reynolds Tobacco Co.*, 11 F. Supp. 2d 850, 852–53 (S.D. Miss. 1998); *Burton* v. *R.J. Reynolds Tobacco Co.*, 884 F. Supp. 1515, 1522 (D. Kan. 1995); *Kotler* v. *American Tobacco Co.*, 731 F. Supp. 50, 51–52 (D. Mass.), aff'd, 926 F.2d 1217 (1st Cir. 1990), cert. granted and judgment vacated on other grounds, 505 U.S. 1215, 112 S. Ct. 3019, 120 L. Ed. 2d 891 (1992); *Dujack* v. *Brown & Williamson Tobacco Corp.*, Superior Court, judicial district of Tolland, Docket No. X07-00728225-S, 2001 WL 34133836, *1–2 (November 13, 2001); *Naegele* v. *R.J. Reynolds Tobacco Co.*, 28 Cal. 4th 856, 865, 50 P.3d 769, 123 Cal. Rptr. 2d 61 (2002); *King* v. *Philip Morris, Inc.*, Docket No. 99-C-856, 2000 WL 34016358, *8–9 (N.H. Super. November 2, 2000); *Schwarz* v. *Philip Morris, Inc.*, 206 Or. App. 20, 65–66, 135 P.3d 409 (2006), aff'd, 348 Or. 442, 235 P.3d 668 (2010).

[19] A question remains whether the incorporation of the ordinary consumer's expectations into our modified test as our focal point would preclude a strict product liability claim on behalf of a foreseeable, but unintended user. Nonetheless, we have no occasion to resolve that question in the present case.

[20] We are not oblivious to the irony that a member of an industry that for decades *disputed* the addictive effect and dangerous health hazards associated with smoking seeks to shield itself from liability by asserting that such dangers were well-known to the ordinary consumer. As the United States Court of Appeals for the Seventh Circuit aptly observed: "If there were such a thing as moral estoppel, the outcome of this appeal would be plain. For decades tobacco companies have assured the public that there is nothing to fear from cigarettes, yet they now slough off lawsuits . . . by professing that everybody knew all along that smoking was risky. In taking this litigation stance, the cigarette makers either are suffering from amnesia or are acknowledging that their propaganda over the years has been ineffectual. Judicial estoppel, however, applies only to inconsistent positions adopted in litigation, and punishing hypocrisy is something left to a court of another realm." *Insolia* v. *Philip Morris, Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).